220 F.3d 1134 (9th Cir. 2000)
 KEVIN THOMAS and JOYCE BAKER, Plaintiffs-Appellees,
v.
ANCHORAGE EQUAL RIGHTS COMMISSION and the MUNICIPALITY OF ANCHORAGE, Defendants-Appellants,
v.
PAULA HALEY in her official capacity as the Executive Director of the Alaska State Commission for Human Rights, Defendant.
KEVIN THOMAS and JOYCE BAKER, Plaintiffs-Appellees,
v.
ANCHORAGE EQUAL RIGHTS COMMISSION and the MUNICIPALITY OF ANCHORAGE, Defendants, v.
PAULA HALEY in her official capacity as the Executive Director of the Alaska State Commission for Human Rights, Defendant-Appellant.
 No. 97-35220 & No. 97-35221
 
 Office of the Circuit Executive
 U.S. Court of Appeals for the Ninth Circuit
 Argued and Submitted July 13, 1998--Anchorage, Alaska
Opinion Filed January 14, 1999
Rehearing En Banc Granted and Opinion Withdrawn Oct. 19, 1999
Argued and Submitted March 23, 2000--San Francisco, California
En Banc Opinion Filed August 4, 2000
 [Copyrighted Material Omitted]
 Cliff J. Groh, Municipal Attorney's Office, Anchorage, Alaska, for appellants Anchorage Equal Rights Commission and Municipality of Anchorage.
 Joanne M. Grace, Robert A. Royce, Office of the Attorney General, Anchorage, Alaska, for appellant Paula M. Haley, Executive Director of the Alaska State Commission for Human Rights.
 Kevin G. Clarkson, Brena, Bell & Clarkson, P.C., Anchorage, Alaska, for the appellees.
 Caroline M. Brown, Covington & Burling, Washington, D.C.; John P. Relman, Washington Lawyer's Committee for Civil Rights & Urban Affairs, Washington, D.C., for amicus curiae the National Fair Housing Alliance.
 Steven T. McFarland, Center for Law & Religious Freedom, Annandale, Virginia, for amici curiae Christian Legal Society, National Council of Churches, Union of Orthodox Jewish Congregations, Church of Jesus Christ of Latter-Day Saints, National Association of Evangelicals, and Ethics and Religious Liberty Commission.
 Mark H. Wittow, Preston Gates & Ellis, Anchorage, Alaska, for amicus curiae Alaska Civil Liberties Union.
 Clyde J. Wadsworth, Heller Ehrman White & McAuliffe, San Francisco, California, for amicus curiae Lambda Legal Defense and Education Fund.
 Michael P. Seng, Chicago, Illinois, for amicus curiae John Marshall Law School Fair Housing Legal Clinic.
 Robert J. Barth, Oak Brook, Illinois, for amicus curiae Institute in Basic Life Principles.
 Sevilla C.P. Claydon, Seattle, Washington, for amici curiae the Northwest Women's Law Center, American Muslim Council, California Women's Law Center, Connecticut Women's Education and Legal Fund, the Feminist Majority Foundation, National Center for Lesbian Rights, National Council of Jewish Women, Women's Law Center of Maryland.
 David K. Flynn, Department of Justice, Washington, D.C., for amicus curiae United States.
 Timothy Dowling, Washington, D.C., for amicus curiae Community Rights Counsel.
 Thomas Reilly, Office of the Attorney General, Oakland, California, for amicus curiae State of California.
 David P. Enzminger, O'Melveny & Myers LLP, Los Angeles, California, for the Anti-Defamation League of B'nai B'rith.
 Eric Grant, Sacramento, California, for amicus curiae Pacific Legal Foundation.
 Appeals from the United States District Court for the District of Alaska, H. Russel Holland, District Judge, Presiding; D.C. Nos. CV-95-0274-HRH CV-95-0275-HRHBefore: Procter Hug, Jr., Chief Judge, James R. Browning, Harry Pregerson, Diarmuid F. O'Scannlain, Ferdinand F. Fernandez, Pamela Ann Rymer, Andrew J. Kleinfeld, A. Wallace Tashima, Susan P. Graber, M. Margaret McKeown, and William A. Fletcher, Circuit Judges.
 McKEOWN, Circuit Judge:
 
 
 1
 This is a case in search of a controversy. Several landlords mount a First Amendment free exercise of religion and free speech challenge to the Alaska housing laws prohibiting discrimination on the basis of marital status. We do not address this constitutional question, however, because this preenforcement challenge presents a threshold issue of justiciability. No prospective tenant has ever complained to the landlords, let alone filed a complaint against them. Neither the Alaska State Commission for Human Rights nor the Anchorage Equal Rights Commission has ever initiated an investigation into the landlords' rental practices or commenced a civil enforcement action or criminal prosecution under the challenged laws. No violation of the laws is on the horizon and no enforcement action or prosecution is either threatened or imminent. Indeed, the principal enforcement agencies had never even heard of these landlords before they filed this action. Simply put, at this stage the dispute is purely hypothetical and the injury is speculative. Whether viewed through the lens of standing or ripeness, resolution of the First Amendment issues is premature. Thus, dismissal of this action is required[1].
 
 BACKGROUND
 
 2
 Kevin Thomas and Joyce Baker[2] (the "landlords") individually own residential rental properties in Anchorage, Alaska. Both are devout Christians who are committed to carrying out their religious faith in all aspects of their lives, including their commercial activities as landlords. Central to their faith is a belief that cohabitation between an unmarried man and an unmarried woman is a sin. The landlords also believe that facilitating the cohabitation of an unmarried couple is tantamount to committing a sin themselves. Based on this religious belief, the landlords claim that they have refused to rent to unmarried couples in the past and that they intend to continue to do so in the future.
 
 
 3
 Both the State of Alaska and the City of Anchorage have adopted laws that outlaw certain forms of discrimination in rental housing and prohibit any refusal to rent on the basis of marital status. The Alaska statute makes it unlawful "to refuse to sell, lease or rent . . . real property to a person because of . . . marital status." Alaska Stat. S 18.80.240(1), (2). The Anchorage ordinance is parallel in this respect. See Anchorage Mun. Code S 5.20.020(A), (B). The laws further prohibit landlords from inquiring about the marital status of prospective tenants or representing to prospective tenants that property is not available because of the tenants' marital status. See Alaska Stat. S 18.80.240(3), (5); Anchorage Mun. Code S 5.20.020(C), (E). Finally, the ordinance, but not the state statute, prohibits publication or advertisement in the leasing of property that indicates a preference based on marital status. See Anchorage Mun. Code S 5.20.020(G). The Alaska Supreme Court has construed the marital status provisions of the laws to prohibit landlords from refusing to rent their properties to unmarried couples. See Foreman v. Anchorage Equal RightsComm'n, 779 P.2d 1199, 1202 (Alaska 1989).
 
 
 4
 The landlords brought this action against Paula Haley, the Executive Director of the Alaska State Commission for Human Rights, the Anchorage Equal Rights Commission, and the Municipality of Anchorage, seeking declaratory and injunctive relief under 42 U.S.C. S 1983 and 28 U.S.C. S 2201. They claimed that the threat of enforcement of the marital status provisions of the anti-discrimination laws infringed their First Amendment rights to free exercise of religion and free speech. Specifically, they argued that their religious beliefs precluded them from renting to unmarried couples and that the laws restricted their ability to communicate those beliefs through advertising or by inquiring about the marital status of prospective tenants. On cross-motions for summary judgment, the district court held that the landlords' claims were justiciable. In a subsequent order, the court concluded that the marital status provisions substantially burdened the landlords' free exercise rights. The court declared the provisions unconstitutional as applied and permanently enjoined the State and the City from enforcing the provisions against the landlords. A divided panel of this court affirmed, and we voted to consider this matter en banc. See Thomas v. Anchorage Equal Rights Comm'n, 165 F.3d 692, withdrawn and reh'g en banc granted, 192 F.3d 1208 (9th Cir. 1999).
 
 DISCUSSION
 
 5
 This case presents a threshold question of ripeness. The Supreme Court instructs that ripeness is "peculiarly a question of timing," Regional Rail Reorg. Act Cases , 419 U.S. 102, 140 (1974), designed to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Abbott Laboratories v. Gardner, 387 U.S. 136, 148 (1967). Our role is neither to issue advisory opinions nor to declare rights in hypothetical cases, but to adjudicate live cases or controversies consistent with the powers granted the judiciary in Article III of the Constitution. See U.S. Const. art. III. Although ripeness, like other justiciability doctrines, is "not a legal concept with a fixed content or susceptible of scientific verification," Poe v. Ullman, 367 U.S. 497, 508 (1961), the Supreme Court has observed that the doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction," Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993). As we noted in Portman v. County of Santa Clara, 995 F.2d 898, 902 (9th Cir. 1993), "the ripeness inquiry contains both a constitutional and a prudential component." We consider each component in turn.
 
 A. Constitutional Component
 
 6
 The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong.[3] Sorting out where standing ends and ripeness begins is not an easy task. Indeed, because the focus of our ripeness inquiry is primarily temporal in scope, ripeness can be characterized as standing on a timeline. Cf. United States Parole Comm'n v. Geraghty, 445 U.S. 388, 397 (1980) (describing mootness as "the doctrine of standing set in a time frame.") (quoting Henry P. Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L.J. 1363, 1384 (1973)). The overlap between these concepts has led some legal commentators to suggest that the doctrines are often indistinguishable. See, e.g., Erwin Chemerinsky, A Unified Approach to Justiciability, 22 Conn. L. Rev. 677,681 (1990). And, in "measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, the ripeness inquiry merges almost completely with standing." Gene R. Nichol, Jr., Ripeness and the Constitution, 54 U. Chi. L. Rev. 153, 172 (1987).
 
 
 7
 Whether the question is viewed as one of standing or ripeness, the Constitution mandates that prior to our exercise of jurisdiction there exist a constitutional "case or controversy," that the issues presented are "definite and concrete, not hypothetical or abstract." Railway Mail Ass'n v. Corsi, 326 U.S. 88, 93 (1945). In assuring that this jurisdictional prerequisite is satisfied, we consider whether the plaintiffs face "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979), or whether the alleged injury is too "imaginary" or "speculative" to support jurisdiction. Id. We need not delve into the nuances of the distinction between the injury in fact prong of standing and the constitutional component of ripeness: in this case, the analysis is the same.
 
 
 8
 We have held that neither the mere existence of a proscriptive statute nor a generalized threat of prosecution satisfies the "case or controversy" requirement. See, e.g., San Diego County Gun Rights Comm. v. Reno, 98 F.3d 1121, 1126-27 (9th Cir. 1996). In a somewhat circular argument, the landlords contend that they are presently injured because they must violate the housing laws to remain true to their religious beliefs, even though their beliefs counsel against violating secular law. This argument is essentially another way of saying that the mere existence of a statute can create a constitutionally sufficient direct injury, a position that we have rejected before and decline to adopt now. See id. (" `[t]he mere existence of a statute . . . is not sufficient to create a case or controversy within the meaning of Article III.' " (quoting Stoianoff v. Montana, 695 F.2d 1214, 1223 (9th Cir. 1983))). Rather, there must be a "genuine threat of imminent prosecution." Id. at 1126.
 
 
 9
 In evaluating the genuineness of a claimed threat of prosecution, we look to whether the plaintiffs have articulated a "concrete plan" to violate the law in question, whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and the history of past prosecution or enforcement under the challenged statute. Id. at 1126-27. Applying these three factors here, we conclude that the landlords' claimed injury--their fear of enforcement or prosecution--fails the constitutional component of the ripeness inquiry[4].
 
 
 10
 Turning to the first prong, it is clear that even if "concrete plan" does not mean cast in stone, the Constitution requires something more than a hypothetical intent to violate the law. Thomas and Baker claim that they have refused to rent to unmarried couples in the past, yet they cannot say when, to whom, where, or under what circumstances. They pledge their intent to do so in the future, yet again they cannot specify when, to whom, where, or under what circumstances. A general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete plan.
 
 
 11
 In San Diego County, we held that a similarly expressed "intent" to engage in conduct proscribed by the Crime Control Act failed to demonstrate that the claimed injury -the threat of prosecution -was reasonable. Id. at 1126-27. " `[S]uch `some day' intentions -without . . . specification of when the some day will be -do not support a finding of the `actual or imminent' injury that our cases require.' " Id. at 1127 (quoting Lujan, 504 U.S. at 564). The landlords' expressed "intent" to violate the law on some uncertain day in the future -if and when an unmarried couple attempts to lease one of their rental properties -can hardly qualify as a concrete plan. Because their free speech claims are similarly contingent on such "some day" intentions and are inextricably linked with the prohibited conduct, they suffer the same infirmity.[5]
 
 
 12
 As for the second factor, a specific threat of enforcement, the record is devoid of any threat -generalized or specific -directed toward Thomas and Baker. Although we do not always require plaintiffs to await arrest or prosecution before entertaining a challenge to the constitutionality of a statute, see Babbitt, 442 U.S. at 298, the threat of enforcement must at least be "credible," not simply "imaginary or speculative." Id. "When plaintiffs `do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible,' they do not allege a dispute susceptible to resolution by a federal court." Id. at 298-99 (quoting Younger v. Harris, 401 U.S. 37, 42 (1971)). No action has ever been brought against the landlords to enforce the marital status provision. There has been no specific threat or even hint of future enforcement or prosecution. Nor could there be, as neither Thomas nor Baker can identify any tenants turned away due to their marital status and no prospective tenant has ever complained to the state or municipal authorities, formally or informally. In fact, appellant Haley never heard of either Thomas or Baker before this action was filed. The threat of enforcement based on a future violation -which may never occur is beyond speculation.
 
 
 13
 The third factor to be considered is the history of enforcement under the statute. In the twenty-five years that these housing laws have been on the books, the record does not indicate even a single criminal prosecution, and of the two reported instances of civil enforcement, only one raised the freedom of religion issue presented here. See Swanner v. Anchorage Equal Rights Comm., 874 P.2d 274 (Alaska 1994) (holding that enforcement of the anti-discrimination provisions did not violate right to free exercise of religion); Foreman v. Anchorage Equal Rights Comm., 779 P.2d 1199 (Alaska 1989) (holding that the marital status provision was intended to protect unmarried couples).[6] These enforcement actions stemmed from complaints filed by actual, prospective tenants. Unlike other cases in which we have held that the government's "active enforcement" of a statute rendered the plaintiff's fear of prosecution reasonable, Adult Video Ass'n v. Barr, 960 F.2d 781, 784 (1992), rev'd on other grounds, 509 U.S. 917 (1993),adopted in pertinent part sub nom. Adult Video Ass'n v. Reno, 41 F.3d 503 (9th Cir. 1994), here the record of past enforcement is limited, was civil only, not criminal, and in any event was in each case precipitated by the filing of complaints by potential tenants.[7] In Swanner and Foreman, the enforcement agency was faced with real people involved in a real controversy, not hypothetical requests for an advisory opinion. Indeed, the agencies are now surely aware of these landlords and still have launched no enforcement proceedings. At most, the past prosecution factor is a neutral one in this case.
 
 
 14
 Considering the applicable factors, we hold that any threat of enforcement or prosecution against the landlords in this case -though theoretically possible -is not reasonable or imminent. The asserted threat is wholly contingent upon the occurrence of unforeseeable events: whether the landlords retain their rental properties; whether an unmarried couple will seek to lease available property; whether the couple, having been denied tenancy, will file a complaint or communicate the alleged discrimination to the enforcement agencies; and whether the enforcement agencies will decide to prosecute. The landlords do not at this time confront "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement," Babbitt, 442 U.S. at 298, and thus this "dispute is not justiciable, because it is not ripe for court review." Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 732 (1998).
 
 B. Prudential Component
 
 15
 Even were we to conclude that Thomas and Baker present a ripe case or controversy in the constitutional sense, we would decline to exercise jurisdiction under the prudential component of the ripeness doctrine. In evaluating the prudential aspects of ripeness, our analysis is guided by two overarching considerations: "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Laboratories, 387 U.S. at 149; see also Hodgers-Durgin v. De La Vina, 199 F.3d 1037, 1040-41 (9th Cir. 1999) (en banc); San Diego County, 98 F.3d at 1132.
 
 
 16
 The manner in which the intersection of marital status discrimination and the First Amendment is presented here, devoid of any specific factual context, renders this case unfit for judicial resolution. The record before us is remarkably thin and sketchy, consisting only of a few conclusory affidavits. "A concrete factual situation is necessary to delineate the boundaries of what conduct the government may or may not regulate." San Diego County, 98 F.3d at 1132. And yet, the landlords ask us to declare Alaska laws unconstitutional, in the absence of any identifiable tenants and with no concrete factual scenario that demonstrates how the laws, as applied, infringe their constitutional rights. This case is a classic one for invoking the maxim that we do not decide " `constitutional questions in a vacuum.' " American-Arab Anti-Discrimination Comm. v. Thornburgh, 970 F.2d 501, 511 (9th Cir. 1992) (quoting W.E.B. DuBois Clubs of America v. Clark , 389 U.S. 309, 312 (1967) (per curiam)).
 
 
 17
 We disagree with the landlords that this case is purely legal. Unlike the situation in Abbott Laboratories, in which the partiesagreed that the constitutionality of the challenged regulation boiled down to a question of congressional intent, the issues presented in the landlords' pre-enforcement challenge here are not purely legal. See San Diego County, 98 F.3d at 1132 (stating that case "devoid of any factual context whatsoever" is not fit for review); American-Arab, 970 F.2d at 510-11 (stating that case "with many unknown facts" and a "sketchy record" is not fit for review). Just as a challenge involving the Sixth Amendment right to counsel was rejected on ripeness grounds in Portman because the "entire argument about the effect of the . . . statute rests upon hypothetical situations and hypothetical clients," 995 F.2d at 903, so too the landlords' claim rests upon hypothetical situations with hypothetical tenants. Similar to the pre-enforcement challenge to the constitutionality of gun control legislation in San Diego County and the challenge to the constitutionality of certain immigration provisions in American-Arab, the First Amendment challenge presented in this case requires an adequately developed factual record to render it ripe for our review. That record, at this point, does not exist.[8]
 
 
 18
 Turning to the second consideration -the hardship to the parties if jurisdiction is withheld -the landlords have not persuaded us that any hardship will result from deferring resolution of this matter to a time when a real case arises. The hardship analysis of our ripeness jurisprudence dovetails, in part, with the constitutional consideration of injury. Although the constitutional and prudential considerations are distinct, the absence of any real or imminent threat of enforcement, particularly criminal enforcement, seriously undermines any claim of hardship. Moreover, by being forced to defend the housing laws in a vacuum and in the absence of any particular victims of discrimination, the State and the City would suffer hardship were we to adjudicate this case now.
 
 
 19
 Prudential considerations of ripeness are discretionary, and here we exercise our discretion to decline jurisdiction over a dispute that is too remote. At this juncture, neither landlord has been charged with violating either the statute or the ordinance. Nor is there any reasonable or imminent threat of enforcement. If and when an enforcement action is brought against Thomas or Baker, that will be the appropriate time to raise the constitutional arguments. Postponing judicial review to a time when the landlords actually face an enforcement proceeding, or at least an imminent threat of one, poses insufficient hardship to justify the exercise of jurisdiction now.
 
 CONCLUSION
 
 20
 Because this action is not ripe for judicial review, we vacate the district court's decision and remand this case to the district court with the instruction to dismiss the action without prejudice.
 
 
 
 Notes:
 
 
 [1]
 Contrary to the view expressed in the concurrence, our decision neither shuts the door to pre-enforcement challenges to laws that allegedly infringe upon constitutional rights, nor does it establish a new approach to justiciability, which under our precedent requires a balancing of several factors. Rather, our decision remains true to our precedent, all of which remains good law.
 
 
 [2]
 Gary Baker, Joyce Baker's husband, is a party to this action but did not participate in this appeal.
 
 
 [3]
 The "irreducible constitutional minimum of standing contains three elements:" (1) injury in fact; (2) causation; and (3) likelihood that a favorable decision will redress the injury. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).
 
 
 [4]
 The penalties for violating the Alaska statute are both criminal and civil in nature. Any individual who "willfully engages in an unlawful discriminatory conduct prohibited by this chapter" is guilty of a misdemeanor and may upon conviction be subject to a $500 fine or up to 30 days in jail. Alaska Stat. S 18.80.270. There are no criminal penalties for a violation of the ordinance. See Anchorage Mun. CodeS 5.30.070 (criminal penalties limited to willful interference with commission's investigation). The civil sanctions for violating the statute and the ordinance are identical. The Commission may seek injunctive relief, initiate an investigation, hold a hearing, and/or issue an appealable compliance order. See Alaska Stat. S 18.80.100-.145; Anchorage Mun. Code S 5.30.010-.090.
 
 
 [5]
 The landlords also contend that the City's prohibition on any advertising referencing a marital status preference violates their right to free speech. See Anchorage Mun. Code S 5.20.020(G). The landlords, however, have never advertised or published such a reference in the past in connection with their rental real estate activities. Nor have they expressed any intent to do so in the future. On this record, the alleged free speech violation does not rise to the level of a justiciable controversy.
 
 
 [6]
 Notably, the opinion does not reveal that the Foremans' refusal to comply with the laws was premised on their religious beliefs. Moreover, appellant Haley states in her affidavit that she was employed as a staff attorney with the Anchorage Equal Rights Commission at the time the Foreman case was pending and, based on her familiarity with the case, attests that it did not involve the freedom of religion issues raised by the landlords here.
 
 
 [7]
 We grant Thomas and Baker's Motion Requesting the Court of Appeals to Take Judicial Notice of an administrative complaint filed with the Alaska State Commission for Human Rights in January 1997. See Alaska State Comm. for Human Rights ex rel. Kristiann Kutzler v. Alaska Pacific Univ., ASCHR No. C-96-010 (Alaska State Commission for Human Rights). The complaint apparently involves married student housing at a private school. Although we grant the motion, the documents are of little import to the outcome of this appeal. All we know is that a complaint was filed. We have no record of actual facts, the course of the proceeding, if any, or the ultimate disposition, if any. And, all the documents proffered are now more than three years old.
 
 
 [8]
 To highlight one example, it is unclear whether the landlords' view on appropriate tenants extends to female roommates, married individuals not living with their spouses, a brother and a sister, a disabled female with a male caretaker, a single father with a female nanny, and so on. Without a more fully developed record, any decision would be wholly advisory. We cannot judge the outer bounds of the application of our decision without knowing the particular contours of the case or controversy.
 
 
 O'SCANNLAIN, Circuit Judge, concurring:
 
 21
 Today, the court, sitting en banc, commendably reshapes this circuit's overly permissive jurisprudence of ripeness and standing by tightening the requirements for bringing lawsuits. These requirements are born of Article III of the Constitution; the same provision that grants judges their authority constrains its use. Standing and ripeness doctrines ensure that an adequate factual and legal context will sharpen and cabin judicial decision-making. They preserve the separation of powers and safeguard democracy by constraining the authority of the unelected judiciaryto pass judgment on the acts of legislatures. Thus, I am delighted to concur in the court's admirable retreat to more appropriate restraint, but write separately to make explicit what the court fails to elaborate.
 
 
 22
 * The new rule of ripeness and standing promulgated today boils down to this: potential litigants aggrieved by existing law--in this case, a state statute and a municipal ordinance-will be virtually unable to bring pre-enforcement challenges in this circuit even in the most sensitive First Amendment context where the laws allegedly burden their freedom of speech and the free exercise of their religion. A preenforcement challenge is no longer available despite averments of having broken the law in the past and explicit intent to violate the law in the future. A pre-enforcement challenge no longer lies even when the statute has been enforced by the state Supreme Court within the previous five years and is currently being enforced against others similarly situated.
 
 
 23
 Under our case law as it existed until today, these landlords' case was ripe. When the matter was before the threejudge panel of which I was a member, we applied the letter and the spirit of our precedents, see Thomas v. Anchorage Equal Rights Comm'n, 165 F.3d 692, 697-700 (9th Cir. 1999), withdrawn by 192 F.3d 1208, in concluding that the preenforcement challenge before us, based on the First Amendment, met all the requirements for justiciability. Now the en banc court, as is its prerogative, reverses and curtails sharply, sub silentio yet most appropriately, several of these precedents. The most significant changes meriting emphasis relate to two factors in the justiciability inquiry: whether a plaintiff sufficiently alleges plans to violate the law and whether a plaintiff has demonstrated an adequate history of enforcement of the law. Notwithstanding suffering reversal of an authored opinion, I concur in the court's new approach to justiciability because I think it is useful to refine the rules governing who can challenge what when in this circuit.
 
 II
 
 24
 The majority's legal analysis quite properly begins by asking whether the landlords, Kevin Thomas and Joyce Baker, face a "realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979). Where, as here, no prosecution is pending, the controversy is ripe if they face a "reasonable threat of prosecution." Ohio Civil Right Comm'n v. Dayton Christian Schs., Inc. , 477 U.S. 619, 625 n.1 (1986). The landlords must demonstrate that prosecution is at least "remotely possible" and "not imaginary or wholly speculative." Babbitt, 442 U.S. at 299, 302.
 
 
 25
 Following our decision in San Diego County Gun Rights Commission v. Reno, 98 F.3d 1121 (9th Cir. 1996), we look first to see if the landlords have articulated "concrete plans to violate the" law. Id. at 1126-27. Here, the court concludes that the landlords have not done so, finding the present situation to be virtually identical to the one in San Diego County. But the situations do differ in one key respect, and, because they do, the court today cuts back on standing more than it openly admits.
 
 
 26
 San Diego County involved a challenge to the Violent Crime Control and Law Enforcement Act, which restricts the manufacture, possession, and transfer of semiautomatic weapons. See id. at 1124. It too was a pre-enforcement challenge by several groups and individuals who alleged that they wished to engage in activities prohibited by the law. See id. We concluded that the plaintiffs did not have standing because they had "not articulated concrete plans to violate the" law. Id. at 1127. It was not enough for the plaintiffs to state that they "wish and intend to engage in activities prohibited by" the law.Id. The court declares that the same is true here.
 
 
 27
 By not acknowledging the differences in the cases, the court's opinion fails to make explicit that it is extending and expanding our holding in San Diego County, not merely applying it. The plaintiffs in that case never alleged that they violated the law in the past. They never articulated specific plans to violate it in the future. See id. (contrasting the allegations of the plaintiffs in Babbitt, 442 U.S. at 303). Yet, "the acts necessary to make plaintiffs' injury--prosecution under the challenged statute--materialize [were] almost entirely within plaintiffs' own control." Id.
 
 
 28
 Unlike the plaintiffs in San Diego County, Thomas and Baker allege that they have violated the law in the past by turning away unmarried couples. Unlike the plaintiffs in San Diego County, the landlords allege that they "would continue to engage in acts regulated under the challenged legislation." Id. Unlike the plaintiffs in San Diego County, whether the landlords can violate the law is not "almost entirely within [their] own control." Id. As landlords, they cannot control when an unmarried couple will come to them seeking an apartment. If they cannot control when the unmarried couples will come, they cannot control when they will violate the law by turning them away. Thus the most that they can do is to state that they plan to violate the law the very next time they have the opportunity to do so. This Thomas and Baker have done. Today, the court demands more; it requires that plaintiffs "specify when, to whom, where, or under what circumstances."[1] But given that the circumstances are not all in their control, one would expect that the landlords have done all that they can.
 
 
 29
 The court, therefore, does much more than apply San Diego County--it expands its holding to a new dimension. The court denies standing where plaintiffs do not control when the violation occurs, but have done all they can to violate the law. Even in the context of First Amendment challenges, litigants who articulate concrete plans to violate the law will not have done enough to meet the requirements for ripeness and standing. A declaratory action, which by its very nature occurs before the plaintiffs are charged with breaking the law, is no longer viable in this circuit when violating the law depends in part on the actions of others. After today, plaintiffs in these situations will have to wait until they get caught, and then challenge the law as a defense to their prosecution. San Diego County has been expanded to that logical extent, and I concur.
 
 III
 
 30
 Next, the court quite properly evaluates whether the statute has been enforced in the past, but in answering that question makes new law.
 
 
 31
 * While these landlords have not yet been specifically targeted, the state has enforced the prohibition of discrimination against unmarried couples in at least two recent published cases: Swanner v. Anchorage Equal Rights Comm'n , 874 P.2d 274 (Alaska 1994), and Foreman v. Anchorage Equal Rights Comm'n, 779 P.2d 1199 (Alaska 1989). Given that these two cases were decided by the Supreme Court of Alaska, it is safe to assume that other enforcement actions have recently been brought as well.[2]
 
 
 32
 Cryptically, the majority refers to the "notable " fact that the Foreman opinion does not reveal whether the Foremans were motivated by their religious beliefs. I am not sure what is notable about this. The statute at issue forbids discrimination against unmarried couples regardless of motive. Until today, we have not held that only prior prosecutions involving the same stated defense rationale as that expressed by the current challenger qualify as prior enforcement actions. Such a policy would produce anomalies, and fortunately the majority appears to stop short of endorsing it here.
 
 B
 
 33
 The court's opinion also overrules, sub silentio, parts of three of our prior decisions: Adult Video Ass'n v. Barr, 960 F.2d 781, 786 (9th Cir. 1992), vacated sub nom. Adult Video Ass'n v. Reno, 509 U.S. 917 (1993), reinstated in relevant part, 41 F.3d 503 (9th Cir. 1994); San Francisco County Democratic Central Comm. v. Eu, 826 F.2d 814 (9th Cir. 1987), aff'd, 489 U.S. 214 (1989); and Bland v. Fessler, 88 F.3d 729 (9th Cir. 1996). It also casts doubt on the continuing validity of several of our other precedents. Again, I am pleased to concur in this clarification of the requirements for ripeness and standing.
 
 
 34
 * The court asserts, in a passing reference to Adult Video, that the history of "active enforcement" of the statute at issue there distinguishes that case from the present one.[3] That is simply not the case. Adult Video and the court's opinion in this case are inconsistent, and as the court today sits en banc, Adult Video has been overruled to that extent.
 
 
 35
 In Adult Video, a producer of sexually explicit videotapes challenged the facial constitutionality of several provisions of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. SS 1961-1968, as applied to obscenity offenses. See 960 F.2d at 783-84. Specifically, Adult Video challenged, on First Amendment grounds, RICO's authorization of pre-trial seizures and post-trial forfeiture. See id. at 784. Because the government had not prosecuted it, Adult Video had to show a reasonable threat of prosecution in order to establish standing and ripeness. Specifically, as Adult Video challenged "more than the Constitutionality of RICO obscenity prosecutions in and of themselves," it had to demonstrate that it "face[d] a reasonable threat of pre-trial seizure or post-conviction forfeiture." Id. at 785. The "active prosecution" which the court's opinion mentions referred only to RICO generally, not to the two specific provisions of the act Adult Video challenged--pre-trial seizures and post-trial forfeitures. See id.
 
 
 36
 Pursuing the justiciability inquiry, we noted first that the government never "conducted pre-trial seizures in RICO obscenity cases" and that it had disclaimed any interest in ever doing so. Id. Yet, we concluded that Adult Video had standing to challenge that provision of the act. See id. Why? Because "the statute authorizes such seizures", "no formal policy of the Department of Justice prohibits its prosecutors or officers from pursuing pre-trial seizures, and enforcement practices may change at any time in any case. Consequently, Adult Video's apprehension concerning pre-trial seizure is reasonable. Therefore, Adult Video does have standing to litigate this claim." Id. That was it.
 
 
 37
 There is no principled distinction between Adult Video and the facts of this case, and therefore today's en banc opinion prevails. Here, the landlords challenge a statute that prohibits the conduct in which they engage. No formal policy of the state or the city prohibits their prosecutors fromenforcing the statute to prevent discrimination against unmarried couples. In fact, the state's highest court has ruled that the statute places an affirmative duty on the state human rights commission to root out discrimination. See Hotel, Motel, Restaurant, Constr. Camp Employees & Bartenders Union v. Thomas, 551 P.2d 942, 945 (Alaska 1976) ("[T]he legislature intended the Commission to be more than a simple complaint-taking bureau; the statutory scheme constitutes a mandate to the agency to seek out and eradicate discrimination in . . . the sale, lease, or rental of real property."). In addition, the state and city have enforced the laws and are currently doing so. Still, the court concludes that is not enough because previous prosecutions under the statute occurred only after complaints. Here no one has complained of the landlords' practices. In Adult Video we discounted the relevance of past prosecution practices by stating that such practices "may change at any time in any case." 960 F.2d at 785. I am pleased that, after today, prosecution practices are once again relevant.
 
 
 38
 In sum, here we have a statute that prohibits the conduct engaged in and we have the absence of any policy against enforcement. The Adult Video panel required no more, but the en banc court does. Adult Video has been overruled to that extent, and I concur.
 
 2
 
 39
 Nor can the court's conclusion that the landlords' claims are not ripe despite the history of at least two enforcement actions be entirely reconciled with Eu. In that case, we held that a pre-enforcement challenge to provisions of the California Elections Code was justiciable despite the fact that the law had never been enforced. See 826 F.2d at 821-23. In that case, we "found justiciability notwithstanding a record of nonenforcement because . . . the record did not show that the statutes had been `commonly and notoriously' violated." Id. at 822 (quoting Poe v. Ullman, 367 U.S. 497, 502 (1961) (holding that a challenge to a statute banning contraception was not justiciable because the law had not been enforced in seventy-five years)). It was enough in Eu that the law had not fallen into desuetude.
 
 
 40
 In this case too, it is clear that the statute has not fallen into desuetude. Although the landlords allege that they have violated the statute by turning away unmarried couples, there is no indication in the record that the statute is "commonly and notoriously violated." Id. Nor is there a lack of enforcement, which, coupled with open violations of the act, would lead one to conclude that the state had no intention of enforcing the law. To the contrary, there is evidence of two enforcement actions that have gone all the way up to the Supreme Court of Alaska and the consequent reasonable likelihood of many more. In Eu, this was sufficient to grant the plaintiffs standing and make the plaintiffs' claims ripe. The court's opinion makes it clear that this will no longer be enough. Eu has been overruled to that extent, and I concur.
 
 3
 
 41
 In Bland, telephone operators and advertisers challenged the constitutionality of a civil statute regulating telephone automatic dialing and announcing devices ("ADADs"). See 88 F.3d at 730-31. As the state had not prosecuted the plaintiffs, this was a pre-enforcement challenge. In contrast to the present case, where the state has undertaken at least two prosecutions, in Bland, the state "had never enforced the civil statute against anyone" in six years. Id. at 737. Nevertheless, we stated:
 
 
 42
 "[w]e are not troubled by the pre-enforcement nature of this suit. The State has not suggested that the newly enacted law will not be enforced, and we see no reason to assume otherwise. We conclude that plaintiffs have alleged an actual and well-founded fear that the law will be enforced against them. Further, the alleged danger of this statute is, inlarge measure, one of self-censorship; a harm that can be realized even without actual prosecution."
 
 
 43
 Id. (quoting Virginia v. American Booksellers Ass'n, 484 U.S. 383, 393 (1988)). In Bland, the state had "not stated affirmatively that [it] would not enforce the civil statute," although it had stated that the Attorney General's office had "not brought or indicated that it would bring any action " under the statute. Id. & n.12. This placed the plaintiff "between the rock of foregoing the use of his ADADs and the hard place of violating the law." Id.
 
 
 44
 In this case, the state and the city have not only not disclaimed any interest in effecting the statute, but have actually enforced it. Indeed they are under an affirmative duty to do so. In this case, as in Bland, the landlords find themselves between the rock of violating their religious beliefs and the hard place of violating the law.[4] In this case, as in Bland, the plaintiffs allege that they must alter their conduct in order to comply with the statute. What was enough for standing in Bland is no longer enough now.[5] Bland has been overruled to that extent, and I concur.[6]
 
 IV
 
 45
 The court begins its opinion by stating that this is a case in search of a controversy. One wonders, rather, whether this is a court afraid of a case. No court would eagerly enter the jurisprudential thicket surrounding the intersection of First Amendment free exercise concerns and civil rights created by fair housing laws. Thus we postpone, perhaps serendipitously, but ineluctably, definitive application of Employment Division v. Smith, 494 U.S. 872 (1990), and its newly developed hybrid rights doctrine to what had been deemed a live controversy arising in one of the states of this circuit. As our three-judge panel opinion and dissent demonstrate, together with the decisions of our sister circuits, Smith itself is fraught with complexity both in doctrine and in practice. See Thomas, 165 F.3d at 700-18 (requiring that a free exercise claim based on the hybrid rights exception must include a colorable claim of infringement of a companionright), 722-27 (Hawkins, J., dissenting) (expressing doubt as to "whether the hybrid rights exception even exists"); Swanson v. Guthrie Indep. Sch. Dist. No. I-L, 135 F.3d 694, 700 (10th Cir. 1998) (requiring that a free exercise claim based on the hybrid rights exception must include at least a colorable claim of infringement of a companion right); EEOC v. Catholic University of America, 83 F.3d 455, 467 (D.C. Cir. 1996) (requiring that a free exercise claim based on the hybrid rights exception must include an independently viable claim of infringement of a companion right); Brown v. Hot, Sexy & Safer Prods., 68 F.3d 525, 539 (1st Cir. 1995) (same); Kissinger v. Board of Trustees, 5 F.3d 177, 180 (6th Cir. 1993) (declining to apply the hybrid rights exception entirely). Perhaps the Supreme Court will have an opportunity before the issue arises again in this circuit to refine its approach in this area in light of the experience of five circuits.
 
 
 46
 In any event, today the court tightens the requirements for ripeness and standing in this circuit, reining in those of our precedents which appeared to encourage every imaginably aggrieved individual to challenge potential enforcement of a law on constitutional grounds. No doubt the court is sincere in its application of these principles and would not use them as doctrines of convenience to avoid deciding a case whose merits appear unappetizing to address. Let us hope that today's shift in this circuit's standing jurisprudence is but the first step in restraining the exuberance with which we have embraced every opportunity to decide an asserted controversy. In that hope and in the court's opinion, I happily concur.
 
 
 
 Notes:
 
 
 [1]
 Of course, the landlords have answered several of the court's questions: "to whom?"--unmarried couples living together; "where?"--at the apartments the landlords own; "under what circumstances?"--when asked to rent an apartment to two unmarried individuals who are physically intimate. Thus, the only remaining issue is when.
 
 
 [2]
 The Alaska State Commission on Human Rights is presently engaged in enforcement action against Alaska Pacific University for alleged discrimination in housing against unmarried couples.
 
 
 [3]
 One wonders if Alaskans will be surprised when they read that the court operates under the impression that the state authorities almost never enforce the antidiscrimination law they passed.
 
 
 [4]
 In this case, the landlords find themselves in an even more difficult dilemma as the very same beliefs that command that they not rent to unmarried couples command that they follow the law. The court finds this argument "circular," stating that it is nothing more than an attempt to evade the principle that mere existence of a statute does not suffice to give plaintiffs standing. I cannot concur in this dismissive interpretation of the landlords' religious beliefs. This is in fact a situation unlike any other. To my knowledge, no producer of obscenity has yet to claim that the same impulses that lead him to produce obscenity require him to follow a law prohibiting such material. Nor did the gun distributors in San Diego County claim that their desire to follow the gun laws and their desire to distribute guns sprang from the same beliefs. Thus the landlords present a truly unique situation to which the court's opinion gives short shrift.
 
 
 [5]
 In Bland we also refused to draw any line between criminal or civil enforcement. See 88 F.3d at 736 n.11. Unlike Bland, the court today appears to draw this distinction. In fact, the court goes one step further and finds it relevant that the criminal enforcement provisions have not, to our knowledge, been used. I am pleased that from now on in deciding justiciability we will take into account both the penalties authorized by the statute and the history of their use.
 
 
 [6]
 The court's opinion casts doubt as well on the continuing validity of Culinary Workers Union Local 226 v. Del Papa, 200 F.3d 614 (9th Cir. 1999). Culinary Workers involved a union's First Amendment challenge to a state statute. The statute had not been enforced and the attorney general's threat to prosecute was rendered meaningless by her apparent lack of authority to do so. See id. at 617-18. Nevertheless, we concluded that whether she actually had prosecutorial authority was irrelevant to the inquiry of whether the threat of prosecution was "imaginary or wholly speculative." Id. at 618. See also Ripplinger v. Collins, 868 F.2d 1043, 1047-48 (9th Cir. 1989) (holding that standing exists for a preenforcement challenge where plaintiffs conducted a business they believed violated the obscenity laws and only one of the fifteen plaintiffs had ever even been investigated).
 
 
 KLEINFELD, Circuit Judge, dissenting:
 
 47
 I respectfully dissent.
 
 
 48
 I agree with Judge O'Scannlain that under the law as it stood until today, plaintiffs had standing and their case was ripe[1]. They still do, under controlling Supreme Court law on standing.
 
 
 49
 We cannot and should not shut the courthouse door to these litigants. The majority takes the position that there is no genuine controversy, because plaintiffs have no genuine and substantial risk that the law they challenge will be enforced against them. That proposition is unsupported by the record.
 
 
 50
 The majority's discussion about the history of enforcement does not support its conclusion. The history matters when a law is in desuetude, but no one claims that this fairly new law is like some nineteenth century ordinance never enforced in living memory. This case involves a fairly recent law that protects rental rights for unmarried couples. What is in desuetude is not the law, but the old expression "living in sin," that used to voice a social consensus condemning what the new law establishes as a right. The recent Alaska Supreme Court decisions in closely analogous cases establish, were there any doubt, that the law is actively enforced.[2]
 
 
 51
 The majority's reference to "some day" intentions, based on Lujan v. Defenders of Wildlife,[3] is irrelevant in this case. That doctrine rejects standing for plaintiffs who, for example, bring environmental lawsuits on the basis that, although they have never even been to the place affected by the proposed development, nevertheless "some day" might want to go there, and theirpleasure would be impaired were the development to proceed. For this case to be analogous to the "some day" environmental cases, it would have to involve a person who is not a landlord but might some day want to buy an apartment building, and if he did, would not want to rent to unmarried couples. Such a person would lack standing. But the plaintiffs in our case already have apartments that they rent out, and they have discriminated against unmarried couples, do discriminate, and will discriminate, because of their religious beliefs about the tenants' sexual conduct. The landlords' violations of the challenged law are not a "some day" possibility, but a yesterday, today, and tomorrow reality.
 
 
 52
 The only factor that cuts against standing is that the plaintiffs have not gotten caught. That is not much of a factor in a First Amendment case. The law is that standing in a First Amendment case does not have to await enforcement of the law against that individual. All it takes, as the majority concedes, is "a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement " which is not "too imaginary" or "speculative" to support jurisdiction.[4] It does not take much of an imagination to come up with the idea that these landlords, who have publicly asserted their presently existing policy of discriminating against unmarried couples, will get caught by the agency that has the affirmative duty of seeking out and remedying violations of the law that prohibits that kind of discrimination.
 
 
 53
 Here are two of the Supreme Court decisions that require us to hold the courthouse door open for these plaintiffs. In both, no enforcement action had been taken against the plaintiffs. In Doe v. Bolton,[5] the Supreme Court held that physicians had standing to challenge an abortion law "despite the fact that the record does not disclose that any one of them has been prosecuted, or threatened with prosecution, for violation of the State's abortion statutes." The Court distinguished a case, as I have above, where "with a single exception, no one had ever been prosecuted" under a "moribund " century-old law[6], likewise in Babbitt v. United Farm Workers National Union,[7] the Court held that a union had standing to challenge a law's constitutionality where it alleged that it might inadvertently violate it, alleged "an intention to continue " in activities that might violate it, and the state had not "disavowed any intention" to prosecute, even though the penalty had never been applied to the kind of conduct at issue.
 
 
 54
 As for the majority's prudential concern about the need for a record to show just whom plaintiffs propose to discriminate against,[8] it is hard to take seriously the concern that we do not know whether plaintiffs mean to discriminate against such unmarried couples living together as a sister and brother, or a disabled individual with a resident caretaker of the opposite sex. Plaintiffs have been perfectly clear that they base their policy on a religious objection to what used to be called "living in sin," that is, a man and woman sharing quarters in circumstances where sexual relations could be reasonably expected without being married to each other.
 
 
 55
 The Christian landlords in this case have demonstrated a higher risk of enforcement than the physicians and the labor union in Doe and United Farm Workers. The defendants might be able to deprive plaintiffs of standing by disavowing any intention to prosecute, but they have not. The "disavow" language in United Farm Workers puts the burden on the governmental entitychallenging standing to "disavow any intention" to enforce the law in the circumstances. Defendants have not disavowed any enforcement intentions; for all we know, they have a case ready to be filed as soon as our mandate issues.
 
 
 56
 The majority takes the position that to have standing in a First Amendment case, a person facing a realistic risk of enforcement of an unconstitutional statute has to have already violated it and been caught. Plaintiffs have already committed the violations, and propose to continue, but so far there has been no enforcement action against them. That is all that is missing from their standing case. But getting caught, or even violating the law in a way that creates a risk of getting caught, is not necessary for standing. "[W]hen fear of criminal prosecution under an allegedly unconstitutional statute is not imaginary or wholly speculative a plaintiff need not`first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute.' "[9]
 
 
 57
 If the majority's stretched standing doctrine arises out of concern about resolving a difficult and important issue, I share the concern. This is a hard case, because the contours of Employment Division v. Smith[10] are as yet undeveloped. Some would read the "hybrid" rights language in Smith so narrowly as to give it little practical applicability,[11] and treat any facially neutral law as constitutionally permissible, despite a religious obligation of some to violate it. Others, like the original panel in this case,[12] would read it more broadly. I doubt that Smith means that any facially neutral law stands, despite a religious obligation to violate it. Suppose, hypothetically, that a legislature passed a facially neutral law prohibiting circumcision, and that its reason was not anti-religious animus, but concern that the possible pain inflicted on the child exceeded the medical benefits from the procedure. Such a law would make it impossible for Jews and Moslems to practice one of their most sacred religious obligations. I suspect that under Smith, the no-circumcision law would be unconstitutional, by analogy to the no-parochial-schools law in Pierce v. Society of Sisters,[13] because the no-circumcision law would abridge both the right to rear one's children in one's religion and the free exercise of one's religion.[14]
 
 
 58
 Now the more difficult case, where it is hard to identify a "hybrid" right. Suppose that a state or municipality prohibited without exception possession or consumption of alcohol, for the purpose of dealing with a widespread local problem of alcoholism and crimes committed by inebriated people. This law would effectively prohibit Catholics and some Protestants from celebrating communion. Would such a law be constitutional under Smith, because neutral, without anti-religious animus, and not "hybrid"? I am troubled by the notion that Smith definitively answers the question in the negative, though it may. The Free Exercise Clause is not mere surplusage. It establishes a constitutional right and has the force of law. Proper construction requires that the clause be construed to establish a right other than and in addition to the rights established by the Free Speech Clause, the Establishment Clause, and the Equal Protection Clause.
 
 
 59
 This case is somewhere in between my two hypothetical cases. Plaintiffs raise the question of whether the right to freely exercise one's religion and the rights to free speech and to control one's propertyare hybrid rights like the ones excepted from Smith's neutrality rule. It is a serious question. They have standing to raise it. They are entitled to an answer. They genuinely and immediately need to know whether a constitutionally valid law prohibits them from acting as they are and have been in the exercise of their religious beliefs. I do not intimate what the answer should be, but am quite sure that we are not entitled under the law to slam the courthouse door on their suit requesting an answer.
 
 
 
 Notes:
 
 
 [1]
 Thomas v. Anchorage Civil Rights Commission, 165 F.3d 692, 697-700 (9th Cir. 1999); see Bland v. Fessler, 88 F.3d 729, 737 (9th Cir. 1996); Adult Video Ass'n v. Barr, 960 F.2d 781, 786 (9th Cir. 1992), vacated sub nom. Adult Video Ass'n v. Reno, 509 U.S. 917 (1993), reinstated in relevant part, 41 F.3d 503 (9th Cir. 1994); San Francisco County Democratic Central Comm. v. Eu, 826 F.2d 814 (9th Cir. 1987), aff'd, 489 U.S. 214 (1989).
 
 
 [2]
 Swanner v. Anchorage Equal Rights Comm'n, 874 P.2d 274 (Alaska 1994); Foreman v. Anchorage Equal Rights Comm'n , 779 P.2d 1199 (Alaska 1989).
 
 
 [3]
 Lujan v. Defenders of Wildlife , 504 U.S. 555, 560 (1992).
 
 
 [4]
 Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979).
 
 
 [5]
 Doe v. Bolton, 410 U.S. 179, 188 (1973).
 
 
 [6]
 Id.
 
 
 [7]
 Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289, 298 (1979).
 
 
 [8]
 Maj. Opinion at 1142 n.8.
 
 
 [9]
 United Farm Workers Nat'l Union , 442 U.S. at 302 (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974)).
 
 
 [10]
 Employment Division v. Smith , 494 U.S. 872 (1990).
 
 
 [11]
 Kissinger v. Board of Trustees , 5 F.3d 177, 180 (6th Cir. 1993).
 
 
 [12]
 Thomas v. Anchorage Civil Rights Commission, 165 F.3d 692 (9th Cir. 1999).
 
 
 [13]
 Pierce v. Society of Sisters , 268 U.S. 510 (1925).
 
 
 [14]
 See Smith, 494 U.S. at 881.