**Kevin THOMAS, Joyce Baker, and Jeffrey Bubna, Appellants/Cross–Appellees,**

v.

**ANCHORAGE EQUAL RIGHTS COMMISSION; the Municipality of Anchorage; and Paula Haley in her Official Capacity as the Executive Director of the Alaska State Commission for Human Rights, Appellees/Cross–Appellants.**

Nos. S–10883, S–10733.

Supreme Court of Alaska.

Dec. 10, 2004.

See also 220 F.3d 1134.

Kevin G. Clarkson, Brena, Bell & Clarkson, P.C., Anchorage, for Appellants/Cross–Appellees.

Constance E. Livsey and Krista Schwarting, Holmes Weddle & Barcott, Anchorage, for Appellees Anchorage Equal Rights Commission and the Municipality of Anchorage.

Robert A. Royce, Assistant Attorney General, Anchorage, and Gregg D. Renkes, At-

torney General, Juneau, for Appellee/Cross–Appellant Haley.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

### OPINION

BRYNER, Chief Justice.

## I. INTRODUCTION

■ The Alaska Statutes and the Anchorage Municipal Code both prohibit landlords from refusing to rent property to persons because of marital status.[1] Ten years ago, in *Swanner v. Anchorage Equal Rights Commission*, we held that enforcing these provisions against an Anchorage landlord who refused to rent to unmarried couples on religious grounds did not violate the landlord's right to free exercise of his religion.[2] In the present case, similarly situated landlords urge us to overrule *Swanner*, insisting that the state and municipal fair housing laws violate their freedoms of religion and speech, and other protected rights. But

1. AS 18.80.240; AMC 5.20.020.

2. 874 P.2d 274, 276 (Alaska 1994).

3. AS 18.80.240(1), (2), (3) and (5) provide:
   It is unlawful for the owner, lessee, manager, or other person having the right to sell, lease, or rent real property
   (1) to refuse to sell, lease, or rent the real property to a person because of sex, marital status, changes in marital status, pregnancy, race, religion, physical or mental disability, color, or national origin; however, nothing in this paragraph prohibits the sale, lease, or rental of classes of real property commonly known as housing for "singles" or "married couples" only;
   (2) to discriminate against a person because of sex, marital status, changes in marital status, pregnancy, race, religion, physical or mental disability, color, or national origin in a term, condition, or privilege relating to the use, sale, lease, or rental of real property; however, nothing in this paragraph prohibits the sale, lease, or rental of classes of real property commonly known as housing for "singles" or "married couples" only;
   (3) to make a written or oral inquiry or record of the sex, marital status, changes in marital status, race, religion, physical or mental disability, color, or national origin of a person seeking to buy, lease, or rent real property;

since the landlords have not clearly convinced us that *Swanner* was wrongly decided, or is no longer sound, or that more good than harm would be done by departing from precedent, we apply the rule of stare decisis and decline to reexamine our holding. Because *Swanner* controls the landlords' claims, we affirm the superior court's order dismissing the case.

## II. BACKGROUND FACTS

Alaska Statute 18.80.240 makes it "unlawful ... to refuse to sell, lease, or rent ... real property to a person because of sex, marital status, [or] changes in marital status"; this statute further prohibits landlords from inquiring about the marital status of prospective tenants or representing to prospective tenants that property is not available because of the tenants' marital status.[3] Anchorage Municipal Code § 5.20.020 sets out parallel prohibitions.[4] The municipal code additionally precludes landlords from publishing any communication with respect to their rental property indicative of marital status discrimination.[5]

   ....
   (5) to represent to a person that real property is not available for inspection, sale, rental, or lease when in fact it is so available, or to refuse to allow a person to inspect real property because of the race, religion, physical or mental disability, color, national origin, age, sex, marital status, change in marital status or pregnancy of that person or of any person associated with that person[.]
   In addition, AS 18.80.270 specifies that a person who wilfully violates these provisions commits a misdemeanor punishable by a $500 fine, thirty days in jail, or both.

4. *See* AMC § 5.20.020(A), (B), (C), (E). Unlike the state statute, however, this provision of the Anchorage code exempts rental space in a landlord's individual home when the landlord and renter would share common areas. Specifically, the opening clause of AMC § 5.20.020 provides:
   Except in the individual home wherein the renter or lessee would share common living areas with the owner, lessor, manager, agent or other person, it is unlawful for the owner, lessor, manager, agent or other person having the right to sell, lease, rent or advertise real property to....

5. Specifically, AMC § 5.20.020(G) makes it unlawful for a lessor to:
   Circulate, issue or display, make, print or publish, or cause to be made or displayed,

In 1994 we rejected a constitutional challenge to these provisions brought by Anchorage landlord Tom Swanner.[6] Swanner had a policy of refusing to rent or show property to unmarried couples based on his Christian religious beliefs.[7] After receiving complaints against Swanner, the Anchorage Equal Rights Commission filed proceedings against him and ultimately found that he had engaged in discriminatory conduct.[8] The superior court upheld this ruling, and Swanner appealed, asserting that the state and municipal anti-discrimination laws violated his rights to the free exercise of his religion under the United States and Alaska Constitutions.[9]

■ Our opinion in *Swanner* determined that there was no merit to these claims under either constitution. Applying the test set out by the United States Supreme Court in *Employment Division, Department of Human Resources v. Smith*[10]—which holds that the United States Constitution usually does not prohibit religious restraints arising incidentally from a neutral and generally applicable law—we concluded that Swanner's federal constitutional rights had not been violated, since the challenged anti-discrimination laws are neutral and generally applicable provisions.[11] Though we acknowledged that *Smith* creates an exception that would require proof of a compelling state interest in "a hybrid situation" where the facts indicated a possible violation of the Free Exercise Clause and some other constitutionally protected right, we found that Swanner's case did not present this kind of hybrid situation, pointing out that Swanner did not contend that any other constitutional right had been

violated.[12] Our opinion in *Swanner* nevertheless applied a more stringent test in addressing Swanner's free exercise claim under the Alaska Constitution. Using the more protective requirements of *Sherbert v. Verner*, which we had previously adopted as a state constitutional measure in *Frank v. State*,[13] we concluded that the challenged laws passed constitutional muster because they furthered a compelling state interest by preventing marital status discrimination and were narrowly tailored.[14] And relying on the same conclusion, we separately held that the disputed laws would withstand federal review under the strict scrutiny test then recently enacted by Congress in the Religious Freedom Restoration Act of 1993.[15]

Soon after *Swanner* was published, Kevin Thomas and Joyce Baker filed suit in the United States District Court in Anchorage, asserting that the Alaska and Anchorage anti-marital discrimination laws violated their free exercise rights under the United States Constitution, and seeking a declaratory judgment enjoining the state and the municipality from enforcing those provisions. Thomas and Baker are Anchorage landlords who are similarly situated to Swanner; their positions and claims in the federal court have been described as follows:

Kevin Thomas and Joyce Baker (the "landlords") individually own residential rental properties in Anchorage, Alaska. Both are devout Christians who are committed to carrying out their religious faith in all aspects of their lives, including their commercial activities as landlords. Central to their faith is a belief that cohabitation between an unmarried man and an

---

printed or published, any communication, sign, notice, statement or advertisement with respect to the use, sale, lease or rental or real property that indicates any preference, limitation, specification or discrimination based on race, religion, age, sex, color, national origin, marital status or physical or mental disability.

6. *Swanner*, 874 P.2d at 276.

7. *Id.* at 277.

8. *Id.*

9. *Id.*

10. 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

11. *Swanner*, 874 P.2d at 279–80.

12. *Id.*

13. 604 P.2d 1068, 1070 (Alaska 1979) (applying compelling state interest test adopted in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).

14. *Swanner*, 874 P.2d at 280–84.

15. *Id.* at 280 n. 9.

unmarried woman is a sin. The landlords also believe that facilitating the cohabitation of an unmarried couple is tantamount to committing a sin themselves. Based on this religious belief, the landlords claim that they have refused to rent to unmarried couples in the past and that they intend to continue to do so in the future.

. . . .

The landlords brought this action against Paula Haley, the Executive Director of the Alaska State Commission for Human Rights, the Anchorage Equal Rights Commission, and the Municipality of Anchorage, seeking declaratory and injunctive relief under 42 U.S.C. § 1983 and 28 U.S.C. § 2201. They claimed that the threat of enforcement of the marital status provisions of the anti-discrimination laws infringed their First Amendment rights to free exercise of religion and free speech. Specifically, they argued that their religious beliefs precluded them from renting to unmarried couples and that the laws restricted their ability to communicate those beliefs through advertising or by inquiring about the marital status of prospective tenants.[16]

The federal district court granted summary judgment to the landlords, declaring that the state and municipal prohibitions of marital discrimination violated their free exercise rights. A divided panel of the Ninth Circuit affirmed this ruling.[17] But the court subsequently granted rehearing en banc and withdrew the panel's opinion.[18] After rehearing the case, the en banc court vacated the judgment and ordered the landlord's action dismissed; describing the action as "a case in search of a controversy," [19] the court ruled that the landlords' constitutional claims should not have been decided on their merits, since the action was not ripe for judicial review.[20]

Joined by another similarly situated Anchorage landlord, Jeffrey Bubna, Thomas and Baker then refiled their case in the Alaska Superior Court. Their superior court action asserted essentially the same "hybrid" violation of free exercise rights that Thomas and Baker had raised in the preceding federal action. The landlords also alleged independent violations of their constitutional rights to free speech and equal protection. In addition, the landlords asked that our decision in *Swanner* be overruled.

Ruling on cross-motions for summary judgment, Superior Court Judge Sharon Gleason rejected these claims. Specifically, the court declined to overrule *Swanner*, finding that the decision remained controlling law in Alaska and was binding on the superior court. The superior court also found *Swanner* controlling on the landlords' free exercise claims, concluding that our opinion in *Swanner* "expressly and unequivocally rejected" their arguments. Last, the court rejected the landlords' claims that the anti-discrimination laws violated their rights to free speech and equal protection. Addressing the free speech claim, the court ruled that, when interpreted narrowly in light of their statutory purpose the challenged provisions extended only to narrow "limitations on commercial speech" occurring in the context of specific "activities undertaken as preliminaries to real estate transactions." The court thus declined to find them impermissibly vague or overbroad. And as for the landlords' equal protection claim, the superior court simply found no merit to their theory that the laws have a disparate impact by creating exceptions that "permit discrimination for secular reasons while forbidding landlords from excluding unmarried cohabitants for religious reasons."

The landlords appeal, renewing their arguments on their free speech and free exercise claims and urging us to overrule *Swanner*.

---

**16.** *Thomas v. Anchorage Equal Rights Comm'n,* 220 F.3d 1134, 1137–38 (9th Cir.2000) (en banc), *cert. denied,* 531 U.S. 1143, 121 S.Ct. 1078, 148 L.Ed.2d 955 (2001).

**17.** *Thomas v. Anchorage Equal Rights Comm'n,* 165 F.3d 692 (9th Cir.1999), *withdrawn and reh'g en banc granted,* 192 F.3d 1208 (9th Cir.1999).

**18.** *Thomas v. Anchorage Equal Rights Comm'n,* 192 F.3d 1208 (9th Cir.1999).

**19.** *Thomas,* 220 F.3d at 1137.

**20.** *Thomas,* 220 F.3d at 1142.

## III. DISCUSSION

### A. Ripeness

We must initially consider the issue of ripeness for judicial review. Relying primarily on the Ninth Circuit's en banc decision and on our own ruling in *Brause v. State, Department of Health & Social Services*,[21] the Alaska Commission for Human Rights insists that "the superior court should have declined to rule on the merits of the Landlords' case and should have dismissed it outright." But the commission's arguments are unconvincing.

The federal court's ruling on ripeness has little bearing on our own determination of the issue. Ripeness is an aspect of standing,[22] and we have often noted that Alaska's standing requirements are more lenient than their federal counterpart, since they favor ready access to a judicial forum.[23] We have consistently found this difference to be important, emphasizing the need to follow our "own unique ... jurisprudence if Alaska standing doctrine is to retain its quality of relative openness."[24]

As for the commission's reliance on *Brause*, the case is inapposite. There, a homosexual couple challenged a state law claiming that it denied them the same benefits it gave married couples.[25] Even though the statute nominally applied to the appellants, we found their declaratory judgment action unripe because their constitutional challenge appeared to be purely hypothetical: they failed to identify any actual harm they might suffer, even assuming that the state continued to enforce the disputed provision.[26] Here, in sharp contrast to the situation we addressed in *Brause*, it seems obvious that the landlords stand to suffer actual prejudice if the state or municipality enforces the challenged laws against them. Indeed, the commission does not seriously dispute this proposition; it argues instead that the landlords cannot sue unless and until these provisions are actually enforced against them. But the record shows a recent history of active enforcement; and the commission does not disavow the possibility of future enforcement. In effect, then, the commission is asking us to hold that the landlords must rely on its good graces and hope for the best until it files charges.

We have never imposed such a stringent requirement as a condition of ripeness or standing. In *State v. Planned Parenthood*, a case decided after *Brause*, the state advanced a similar argument in an attempt to defeat the claims of two physicians who sought to challenge a law requiring parental consent to abortion.[27] The state contended that "both doctors lack standing because neither faces a specific threat of prosecution or alleges past prosecutions."[28] In rejecting this argument, we held that "the doctors need not allege such drastic harm to meet Alaska's lenient test of standing."[29] We went on to hold that the risk of enforcement alone sufficed for standing, since the challenged law "would require both doctors to change their current practices and would expose them to civil and criminal liability if they failed to comply."[30]

We see no sound basis for distinguishing *Planned Parenthood* from the present case. If we denied standing here, the landlords would similarly be forced to change their rental practices or expose themselves to civil

**21.** 21 P.3d 357 (Alaska 2001).

**22.** *See, e.g., Brause*, 21 P.3d at 359 n. 6, (quoting 13A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER AND RICHARD D. FREER, ET AL., FEDERAL PRACTICE AND PROCEDURE § 3532.1, at 101 (Supp.2000)).

**23.** *See, e.g., Trustees for Alaska v. State*, 736 P.2d 324, 327 (Alaska 1987) ("We have 'departed from a restrictive interpretation of the standing requirement,' adopting instead an approach 'favoring increased accessibility to judicial forums.' ") (internal citations omitted).

**24.** *Bowers Office Prods., Inc. v. Univ. of Alaska*, 755 P.2d 1095, 1097 n. 5 (Alaska 1988).

**25.** *Brause*, 21 P.3d at 357–58.

**26.** *Id.*

**27.** 35 P.3d 30, 34 (Alaska 2001).

**28.** *Id.*

**29.** *Id.*

**30.** *Id.*

and criminal liability. These circumstances are sufficient to meet Alaska's lenient test of standing. We conclude that the superior court did not abuse its discretion in refusing to dismiss the claims as unripe for judicial review.[31]

## B. Stare Decisis

The commission advances a more convincing alternative argument against reaching the merits of the landlords' claims: even if we determine that the landlords have standing to raise their constitutional claims, the commission argues, "*Swanner* should be applied to deny . . . their requested relief under the common law principle of *stare decisis*."

The stare decisis doctrine rests on a solid bedrock of practicality: " 'no judicial system could do society's work if it eyed each issue afresh in every case that raised it.' "[32] In recognizing the importance of this doctrine, we have consistently held that a party raising a claim controlled by an existing decision bears a heavy threshold burden of showing compelling reasons for reconsidering the prior ruling: "We will overrule a prior decision only when clearly convinced that the rule was originally erroneous or is no longer sound because of changed conditions, and that more good than harm would result from a departure from precedent."[33]

Here, the landlords' free exercise claims fall squarely within the ambit of our opinion in *Swanner*.[34] Indeed, the landlords specifically seek to overrule *Swanner*, insisting that "Mr. Swanner was a landlord virtually identical to Thomas, Baker and Bubna." But while they strenuously criticize *Swanner's* reasoning and holding in many re-

spects, the landlords do not convincingly show good cause to revisit this precedent.

### 1. First element of stare decisis: original error or current unsoundness

To meet the first essential element of the stare decisis test, the landlords bear the burden of convincingly demonstrating either that *Swanner* was originally erroneous or that intervening changes have made it unsound.[35]

### a. The "originally erroneous" requirement

A decision is "originally erroneous" if it "proves to be unworkable in practice."[36] But the landlords here do not show that *Swanner* has proved unworkable in practice. They do suggest that *Swanner* left them with an unfair and unworkable moral dilemma by failing to meaningfully consider the right to free exercise of religion under *Smith's* "hybrid" rights theory, by mistakenly finding that the challenged anti-discrimination laws—especially their built-in exceptions— are facially neutral and generally applicable, and by leaving intact the laws' vague and overbroad provisions restraining free speech. Yet to override the rule of stare decisis, the landlords need to show not just that *Swanner* failed to meaningfully address these points, but that they would *clearly* have prevailed if the points had been fully considered.

Here, no showing of clear and obvious error has been made. Despite the landlords' assertions to the contrary, *Swanner* did not ignore or overlook the "hybrid" rights exception to *Smith's* general rule. Although *Swanner* found no need to discuss the theory, our observation in *Swanner* that no "hybrid" violation had been alleged demon-

---

**31.** Since Alaska law gives the trial court discretion to "declare the rights and legal relations of an interested party" in the case of an actual controversy with the state, *see* AS 22.10.020(g), we review the superior court's decision on justiciability for abuse of discretion. *See Brause,* 21 P.3d at 358.

**32.** *Pratt & Whitney Canada, Inc. v. United Technologies,* 852 P.2d 1173, 1175 (Alaska 1993) (quoting *Planned Parenthood v. Casey,* 505 U.S. 833, 854, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)).

**33.** *State, Commercial Fisheries Entry Comm'n v. Carlson,* 65 P.3d 851, 859 (Alaska 2003) (internal quotations omitted).

**34.** We reject the landlords' contention that *Swanner* does not squarely control their free exercise claim because it failed to address or incorrectly decided various free exercise arguments that the landlords now emphasize.

**35.** *Carlson,* 65 P.3d at 859.

**36.** *Pratt & Whitney,* 852 P.2d at 1176 (citing *Casey,* 505 U.S. at 854, 112 S.Ct. 2791).

strates our recognition of the theory and our implicit view that it had no clear and obvious application to the matter at issue.[37] The landlords' current arguments on this theory fall well short of convincing us that *Swanner* clearly would have been decided differently had the theory been raised. To the contrary, the landlords' current "hybrid" rights arguments convincingly illustrate that this constitutional theory remains controversial and largely undefined: considerable uncertainty continues to surround the doctrine's meaning, scope, and correct application—and, indeed, its very existence.[38] Hence, although the landlords' hybrid rights arguments certainly raise difficult and debatable constitutional questions, they fail to convincingly show that our holding in *Swanner* was clearly in error.[39]

The landlords fare no better in criticizing *Swanner's* view that the challenged laws were facially neutral and generally applicable[40]—a view that potentially affects the analysis of free exercise rights under both the *Smith* test and the test set out in *Sherbert*.[41] As already mentioned above, the superior court's decision in the present case expressly found the landlords' contentions on this point to be lacking in merit. But even assuming that the landlords raised a fairly debatable issue on the neutrality and general applicability of the challenged laws, their arguments would still fail to make a clearly convincing showing that *Swanner* wrongly decided the issue.

The landlords' arguments rely largely on the state statute's exception for "singles only" and "married couples only" classes of housing. The superior court found no evidence that this exception had any discriminatory intent or impact. Despite their strenuous protests to the contrary, the landlords offer no persuasive reason to challenge the superior court's findings. Notably, both the legislative history of this exception and the state commission's interpretation of it in past

**37.** 874 P.2d at 280.

**38.** *See, e.g., Civil Liberties for Urban Believers v. City of Chicago,* 342 F.3d 752 (7th Cir.2003) (finding that both claims must individually have merit for heightened scrutiny to occur); *Leebaert v. Harrington,* 332 F.3d 134 (2d Cir.2003) (finding hybrid right may not exist, and if it does, it does not warrant strict scrutiny); *Miller v. Reed,* 176 F.3d 1202 (9th Cir.1999) (finding hybrid right can exist but claims must be violation of fundamental rights); *Reich v. Shiloh True Light Church of Christ,* 85 F.3d 616, No. 95–2765, 1996 WL 228802 (4th Cir. May 7, 1996) (per curiam) (finding hybrid right exists but free exercise claim fails compelling interest test); *EEOC v. Catholic Univ. of America,* 83 F.3d 455 (D.C.Cir. 1996) (finding existence of hybrid right claim, but deciding case on other grounds); *Thiry v. Carlson,* 78 F.3d 1491 (10th Cir.1996) (finding hybrid right claim to exist but that claim at issue was not such a claim); *Brown v. Hot, Sexy and Safer Prods., Inc.,* 68 F.3d 525 (1st Cir.1995) (finding a hybrid claim warrants strict scrutiny but did not apply); *Kissinger v. Board of Trustees,* 5 F.3d 177 (6th Cir.1993) (refusing to decide hybrid right claims without clarification from Supreme Court); *Cornerstone Bible Church v. City of Hastings,* 948 F.2d 464 (8th Cir.1991) (finding hybrid right can exist); *Salvation Army v. N.J. Dep't of Cmty. Affairs,* 919 F.2d 183 (3d Cir.1990) (finding freedom of association is derivative of free exercise right and rejecting hybrid claim); *Chalifoux v. New Caney Indep. Sch. Dist.,* 976 F.Supp. 659 (S.D.Tex.1997) (finding hybrid right exists); *City Chapel Evangelical Free Inc. v. City of South Bend,* 744 N.E.2d 443 (Ind.

2001) (acknowledging hybrid right claim but remanding for further findings); *Hill–Murray Fed. of Teachers v. Hill–Murray High Sch.,* 487 N.W.2d 857 (Minn.1992) (finding hybrid right claim exists and compelling interest analysis would apply); *Health Serv. Div. v. Temple Baptist Church,* 112 N.M. 262, 814 P.2d 130 (App.1991) (acknowledging hybrid rights language but did not apply to facts of the case); *N.Y. State Emp. Rel. Bd. v. Christ the King Reg'l High Sch.,* 90 N.Y.2d 244, 660 N.Y.S.2d 359, 682 N.E.2d 960 (1997) (acknowledging hybrid rights language, but finding it inapplicable); *First United Methodist Church of Seattle v. Hearing Examiner for Seattle Landmarks Pres. Bd.,* 129 Wash.2d 238, 916 P.2d 374 (1996) (finding hybrid right claim for free exercise and free speech).

**39.** *Cf. Thomas v. Anchorage Equal Rights Comm'n,* 220 F.3d 1134, 1150–51 (9th Cir.2000) (en banc) (Kleinfeld, J., dissenting) (describing the landlords' federal "hybrid" rights claim as raising "a serious question" falling "somewhere in between" two hypothetical cases in which the results of the *Smith* test would seem clear).

**40.** *Swanner* determined that these laws applied equally to all people involved in renting and selling property, and did not expressly or implicitly disfavor religious groups. *Swanner,* 874 P.2d at 280.

**41.** *See generally City of Boerne v. P.F. Flores,* 521 U.S. 507, 514, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

litigation suggest that the legislature intended that the exception would allow landlords considerable latitude to designate particular units or blocks of apartments as "singles only" or "married couples only," provided that the landlords established these classifications before offering the properties for rental—thus eliminating the risk of discriminating against prospective tenants on a case-by-case basis.[42]  The landlords do not assert that their religious beliefs compel them to rent to classes of tenants other than "singles only" or "married couples"; nor do they satisfactorily explain why they could not take advantage of this exception to mitigate any financial hardship they might otherwise experience by complying with the anti-discrimination provision.

The landlords further suggest that *Swanner* should be deemed to have been wrongly decided because the statutory scheme it approved inevitably exposes them, and other similarly situated religious landlords, to intolerable restraints on their constitutional rights to free speech.  But the superior court persuasively answered this contention by strictly construing the challenged laws to extend only to narrow "limitations on commercial speech" of the kind that is integral to "activities undertaken as preliminaries to real estate transactions."  The superior court's narrow construction of the statutes comports with their underlying purpose and defeats the landlords' vagueness and overbreadth claims.[43]

### b.  The "intervening changes" requirement

As an alternative to demonstrating that *Swanner* was wrong when it was originally decided, the landlords could meet their burden of establishing the first element needed to overcome the rule of stare decisis by making a clear and convincing showing that the decision is no longer sound because conditions have changed.[44]  But the landlords' claims reveal few salient factual changes:  the landlords' situation is nearly indistinguishable from the one we considered in *Swanner*.

The landlords nonetheless allege that their current situation differs markedly from *Swanner* because the law has now changed.  As we have previously recognized,

> a prior decision may be abandoned because of "changed conditions" if "related principles of law have so far developed as to have left the old rule no more than a remnant of abandoned doctrine, [or] facts have so changed or come to be seen so differently, as to have robbed the old rule of significant application...." [45]

The landlords claim here that *Swanner* has recently been overruled by the Supreme Court's decision in *Boy Scouts of America v. Dale*.[46]  Though they acknowledge that *Dale* dealt with associational freedom, not free exercise of religion, and so does not directly overrule *Swanner*, the landlords insist that "*Swanner* has been overruled sub silentio by

**42.**  *See* Brief of Amicus Curiae Alaska State Commission For Human Rights, *Foreman v. Anchorage Equal Rights Comm'n*, S–2677/S–2716 at 7–19 (July 28, 1988); *cf.  Foreman v. Anchorage Equal Rights Comm'n*, 779 P.2d 1199, 1203 (Alaska 1989) (noting that AS 18.80.240(2) "permits an owner to rent housing for 'singles' or 'married couples' only" but does not apply to landlord who "rented to all classes of persons" and "did not purport to rent only to single people, or only to married people").

**43.**  Indeed, in reply to the state commission's argument that restrictions like these are permissible under the Supreme Court's decision in *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 389, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973) (any First Amendment interest otherwise arguably served by advertising commercial proposal is altogether absent when restriction on advertising is incidental

to valid limitation of commercial activity itself), the landlords concede that their free speech claim completely depends on the validity of their free exercise claim:  "The Landlords agree that if the government may *constitutionally* prohibit and legally sanction their religiously based refusal to rent to unmarried cohabitators, then their desired speech is illegal, and *Pittsburgh Press* controls."

**44.**  *Pratt & Whitney*, 852 P.2d at 1176.

**45.**  *Id.* at 1176 (quoting *Casey*, 505 U.S. at 833, 112 S.Ct. 2791).

**46.**  530 U.S. 640, 120 S.Ct. 2446, 147 L.Ed.2d 554 (2000).  The landlords also assert the Court's decision in *Dale* was foreshadowed by its ruling in *Hurley v. Irish–American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).

Dale." In the landlords' view, *Dale* stands for the general proposition that anti-discrimination laws like those challenged here must fail when placed in opposition to "a serious fundamental First Amendment right."

But it seems reasonable to wonder whether "sub silentio" rulings—in other words, rulings that inform existing law by mere force of analogy—can ever trump stare decisis by establishing "changed conditions" that "have so far developed as to have left the old rule no more than a remnant of abandoned doctrine." [47]   And more to the point, the landlords' reading of *Dale* overstates the opinion's holding.   For the Supreme Court in *Dale* did not broadly rule, as the landlords suggest, that First Amendment rights should generally be deemed more compelling than laws barring marital discrimination; instead, the Court expressly found New Jersey's claim of compelling interest attenuated in the particular situation at issue there because New Jersey law extended its anti-discrimination requirements to private groups whose activities fell well beyond those usually involved in providing public accommodations. [48] This same observation obviously would not hold true in the circumstances at issue here, since the challenged Alaska and Anchorage laws deal exclusively with the core activity of providing public accommodations.   It follows that *Dale* does not clearly and convincingly undermine *Swanner's* continuing soundness.

### 2. Second element of stare decisis: "more good than harm" requirement

The landlords' failure to convincingly demonstrate *Swanner's* original or current unsoundness makes the second requirement for overriding the stare decisis rule academic. But it seems worthwhile to emphasize that even if the landlords could establish good reasons to suppose that *Swanner* was wrongly decided or is currently unsound, we would not override the doctrine of stare decisis unless they also clearly established that "more good than harm would result" from

overruling that decision. [49]   In our view, the potential benefits of overruling *Swanner* have not been clearly established here.   The Ninth Circuit's en banc decision in this case sheds useful light on this point.   That decision aptly summarized the serious disadvantages of attempting to resolve the difficult constitutional issues raised by the landlords without having a particularized controversy and a solid framework of facts:

> The manner in which the intersection of marital status discrimination and the First Amendment is presented here, devoid of any specific factual context, renders this case unfit for judicial resolution.   The record before us is remarkably thin and sketchy, consisting only of a few conclusory affidavits.   "A concrete factual situation is necessary to delineate the boundaries of what conduct the government may or may not regulate."   And yet, the landlords ask us to declare Alaska laws unconstitutional, in the absence of any identifiable tenants and with no concrete factual scenario that demonstrates how the laws, as applied, infringe their constitutional rights.   This case is a classic one for invoking the maxim that we do not decide " 'constitutional questions in a vacuum.' "
>
> . . . .
>
> Moreover, by being forced to defend the housing laws in a vacuum and in the absence of any particular victims of discrimination, the State and the City would suffer hardship were we to adjudicate this case now. [50]

Of course we recognize that the federal court discussed these prudential concerns in connection with the threshold issue of ripeness for judicial review—a separate procedural matter that we have resolved in the landlords' favor.   Yet the federal court's concerns seem equally relevant to our stare decisis analysis, since they weigh heavily against any hasty assumption that we would do more good than harm by attempting to reconsider *Swanner* in this case as it cur-

---

**47.**   *Pratt & Whitney,* 852 P.2d at 1176 (quoting *Casey,* 505 U.S. at 833, 112 S.Ct. 2791).

**48.**   530 U.S. at 646–50, 120 S.Ct. 2446.

**49.**   *Carlson,* 65 P.3d at 859 (internal quotations omitted).

**50.**   *Thomas,* 220 F.3d at 1141–42 (citations omitted).

rently stands. To the extent that they are relevant to our stare decisis analysis, then, the federal court's well-founded concerns deserve to be heeded, even though Alaska's lenient rule of standing has led us to disagree with the federal court's decision on ripeness. After all, we can see no good reason to hold that the landlords' undeniable right to pursue their claims in Alaska's courts should lighten the usual burden that any litigant must bear to overcome the force of precedent under stare decisis.

## IV. CONCLUSION

Although the landlords have standing to pursue their claims in Alaska's courts, they have failed to show conditions warranting departure from the doctrine of stare decisis. Because we conclude that *Swanner* completely controls the landlords' free exercise claims and that their free speech arguments lack independent merit, we AFFIRM the superior court's summary judgment order dismissing the landlords' complaint.