NOTICE

*Memorandum decisions of this court do not create legal precedent.  A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| WILSON W., ) | |
| ) | Supreme Court No. S-14803 |
| Appellant, ) | |
| ) | Superior Court Nos. 3PA-10-00013, |
| ) | 00014, 00015 CN |
| v. ) | |
| ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, ) | |
| OFFICE OF CHILDREN'S SERVICES, ) | No. 1468 – September 18, 2013 |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, Gregory Heath, Judge.

Appearances: Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Appellant.  Julie M. Fields, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

I.    **INTRODUCTION**

A father appeals the termination of his parental rights to three of his children.  Finding no error in the trial court's decision, we affirm.

---

\*      Entered under Alaska Appellate Rule 214.

## II.    FACTS AND PROCEEDINGS[1]

Wilson W. is the father of Marco, Dustin, and Skyla.  Sarah G. is their mother.  The children are Indian children as defined in the Indian Child Welfare Act[2] (ICWA).  This is the fourth child in need of aid (CINA) appeal related to this family.[3]

The State of Alaska, Department of Health and Social Services, Office of Children's Services (OCS) first took custody of the children in 2006 after a report of domestic violence in the home, but it had investigated a number of reports regarding the children before it took custody of them.[4]  Our opinion in Wilson's first appeal describes some of the reports related to domestic violence in the home and Wilson's hostility towards OCS.[5]  We decided in that appeal that OCS was excused from active efforts towards Wilson because of his hostility and threats of violence against OCS workers, and we affirmed the superior court's decision that the children were in need of aid.[6]

---

[1]    We use pseudonyms to protect the privacy of the parties.

[2]    25 U.S.C. §§ 1901-1963 (2006).

[3]    Wilson appealed the trial court's adjudication order in an earlier CINA case. *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94 (Alaska 2008).  Sarah G. appealed the adjudication order in this CINA proceeding as well as the judgment terminating her parental rights. *Sarah G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1456, 2013 WL 1390732 (Alaska, Apr. 3, 2013); *Sarah G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 264 P.3d 831, 832 (Alaska 2011).

[4]    *See Wilson W.*, 185 P.3d at 96-97 (describing family's contacts with OCS leading up to removal in 2006).

[5]    *Id.* at 96-99, 101-02.

[6]    *Id.* at 101-03.

In June 2009, at about the same time the parents' divorce became final, OCS returned the children to Sarah's custody.[7] The divorce decree restricted Wilson's visitation because of domestic violence, permitting only supervised visitation until he completed a domestic violence intervention program and a psychological assessment; visitation was to be supervised by Alaska Family Services.

In February 2010 OCS removed the children from Sarah's care after a domestic violence incident in Sarah's Wasilla home involving Marco, Sarah, and Sarah's then-boyfriend Frank, and placed the children in out-of-home placements.[8] Wilson lived in a remote area near Trapper Creek and did not provide OCS with his telephone number. He left one voice mail for an OCS social worker sometime before June 2010; according to the social worker, Wilson was "very upset about what had happened." The only other contact that social worker had with Wilson was in the courtroom. Wilson did not sign any of the case plans; his attorney signed that he (the attorney) had "participated" and received a copy of one case plan on April 13, 2010.

The court held a contested adjudication trial over the course of several days from June to November 2010. At the outset of the adjudication trial, the court indicated that Wilson "really ha[d] no legal rights to have any custody of the children at this point" because of the divorce decree. The court concluded that Wilson could not "contest that they're children in need of aid regarding him." The vast majority of the adjudication trial focused on Sarah's household and her substance abuse.

The social worker testified that Wilson was not compliant with his case plan. Wilson testified that he had not had any contact with the children since they were taken into OCS custody in 2006. He testified that he was "not allowed to see them"

---

[7]     *Sarah G.*, 264 P.3d at 832.

[8]     *Id.*

because of a court order. Wilson attributed the children's 2006 removal to Sarah's substance abuse, her mental health problems, and her domestic violence. Wilson admitted striking Sarah when they lived together, but said he had done so only in self-defense. He testified that Sarah harassed him after the divorce by coming to his house, cursing at him, and throwing rocks at him.

Wilson agreed that his case plan in the 2006 case required him to complete anger management and parenting classes as well as doing "something about substance abuse." He said that he had not complied with the requirements of his 2006 case plan because he "objected to them." He did not know whether he had a case plan for the 2010 case, saying that he did not "read most of the stuff because it's too stressful." Although Wilson testified he was willing to fulfill the case plan requirements in the new case, he had "no idea" where he could complete the domestic violence program and did not know whether one was available in his area. He testified that in the 2006 case he had contacted the social worker numerous times and had not received a return call; he then "let them know how dissatisfied [he] was with their actions and how they treated [his family], and [he] was labeled as uncontrollable, irrational." He said he had "given up on the system." With respect to the divorce decree requirements, Wilson said he would start the domestic violence intervention program when he got the money to do so, but he did not know when he would get the psychological assessment. He said he was not able to comply with the divorce decree because he lived "way out in the woods" and did not drive; he blamed Sarah for his having to move "further out into the woods."

In December 2010 the court found that the children were in need of aid. Sarah appealed the adjudication decision; we affirmed the decision.[9]

---

[9] *Id.* at 385.

Nothing in the record indicates Wilson did anything to comply with his case plan or the provisions of the divorce decree after the adjudication hearing. In January 2012 OCS asked the court to terminate Sarah's and Wilson's parental rights. OCS alleged that Wilson had abandoned the children. Trial on the termination petition was held in April 2012. The trial focused primarily on the needs of the children and on Sarah's behavior.[10] There was little testimony about Wilson.

Raymond Edwards, the social worker who worked with the family from July 2010 to May or June 2011, testified that he had no way of contacting Wilson because Wilson would not give OCS his telephone number and address. Edwards said he was not able to engage Wilson in planning because OCS did not have an address for him. Edwards also said that Wilson had made "really no efforts" to support and communicate with his children and that while Wilson had "made some overtures at one point," Wilson "didn't want . . . his phone number or address in any of the CINA documents." Edwards testified that even if Wilson had complied with the requirements of the divorce decree, "an extended period of some kind of family therapy" would have been needed before Wilson and the children could have begun contact. Edwards stated that in his opinion, Wilson had shown a conscious disregard of his parental responsibilities. Edwards discussed the services OCS provided to the entire family to assist in reunification, including therapy for the children, transportation for Sarah to visit the children, and information about service providers that Sarah could contact to work on her case plan.

Jennifer Dale, the OCS social worker assigned to the case in June 2011, testified that she got an address for Wilson and sent him letters about placement changes

_____

[10]     *See Sarah G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1456, 2013 WL 1390732, at *1-*2, *6 (Alaska, Apr. 3, 2013) (describing trial evidence regarding the children's needs and Sarah's behavior).

and reviews; these letters came back to her. Dale was not able to call Wilson because she did not have a telephone number for him. She testified that Wilson's attorney told her Wilson did not want to be contacted. Dale also testified that Wilson had done nothing to comply with his case plan; he did not ask for transportation assistance and made no efforts to have visitation with the children. Dale testified about services the family received, including urinalysis testing to monitor Sarah's drug use, transportation expenses for visitation, counseling, and clothing vouchers.

Wilson testified that he had completed one court-ordered anger-management class at some point in the past, but could not recall whether he completed "even half of another one." He testified that he had not been arrested since he divorced Sarah; he also had not worked during that time, in part because of his criminal convictions and in part because he had back problems. Wilson said that he "disagreed" with the case plan requirements but would have done them if he had been able to afford them. When asked whether he had contacted a service provider for the domestic violence program, Wilson said he was "informed that nobody in the valley would touch [him] because of OCS's recommendation, saying that [he] was a violent and volatile individual, or something." Wilson admitted he had never paid child support.

The court issued a lengthy written order terminating the parental rights of both parents in June 2012. The court terminated Wilson's parental rights pursuant to AS 47.10.013,[11] finding that he had abandoned the children. The court noted that Wilson

---

[11]    AS 47.10.013 provides in part:

For purposes of this chapter, the court may find abandonment of a child if the parent or guardian has shown a conscious disregard of parental responsibilities toward the child by failing to provide reasonable support, maintain regular contact, or provide normal supervision, considering the

(continued...)

had been "given the opportunity to have contact with his children if in compliance with the custody order in the divorce case" but had "not take[n] advantage of this opportunity." It also found that Wilson had been "offered services in this CINA case which could have led to family contact" but that he had "been completely non-participatory in his case plan."

Sarah separately appealed the termination of her parental rights; we affirmed the termination of her rights.[12] Wilson now appeals the termination of his parental rights, arguing only that, contrary to the trial court's finding, OCS failed to make active efforts to prevent the breakup of his family.[13] He asks us to reconsider *Dashiell*

---

[11]    (...continued)
child's age and need for care by an adult.

The statute also lists specific conduct constituting abandonment, including making only minimal efforts to support and communicate with the child and "fail[ing] to participate in a suitable plan or program designed to reunite" the family. AS 47.10.013(a)(2), (4).

[12]    *Sarah G.*, 2013 WL 1390732 at *8.

[13]    Under ICWA and relevant Alaska Child in Need of Aid (CINA) statutes and rules, parental rights to an Indian child may be terminated at trial only if OCS shows:

(1) by clear and convincing evidence that:

(a) the child is a child in need of aid as defined by statute (CINA Rule 18(c)(1)(A));

(b) the parent has not remedied the conduct or conditions that place the child at substantial risk of harm or has failed within a reasonable time to remedy the conduct or conditions so that the child would be at substantial risk of physical or mental injury if returned to the parent (CINA Rule 18(c)(1)(A)(i) – (ii)); and

(c) active (but unsuccessful) efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family (CINA Rule 18(c)(2)(B)); and

(continued...)

*R. v. State, Department of Health & Social Services, Office of Children's Services*[14] and to decide that any efforts OCS made to assist Sarah should not be considered in evaluating whether it made active efforts in his case.

## III.    STANDARD OF REVIEW

The question whether OCS made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of an Indian family is a mixed question of law and fact.[15]  We review factual findings for clear error and conclusions of law de novo.[16]  A factual finding is clearly erroneous if this court is "left with a definite and firm conviction a mistake has been made after a review of the entire record in the light most favorable to the party prevailing below."[17]

---

[13]    (...continued)

(2) beyond a reasonable doubt, supported by expert testimony, that an Indian child is likely to suffer serious emotional or physical damage if returned to the parent's custody (CINA Rule 18(c)(4)); and

(3) by a preponderance of the evidence that the child's best interests would be served by termination of parental rights (CINA Rule 18(c)(3)).

[14]    222 P.3d 841, 850 (Alaska 2009) (holding that trial court correctly considered efforts directed at mother when considering active efforts in father's termination case because they were "an important aspect of the state's active efforts to keep the family together.").

[15]    *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 961 (Alaska 2013) (citing *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010)).

[16]    *Id.* (citations omitted).

[17]    *Lucy J.*, 244 P.3d at 1111 (citations and internal quotation marks omitted).

## IV. DISCUSSION

### A. The Trial Court Did Not Err In Finding That OCS Made Active Efforts To Provide Services To Prevent The Breakup Of This Indian Family.

Wilson argues that the trial court erred when it concluded that OCS had shown by clear and convincing evidence that it made active and reasonable efforts to prevent the breakup of his Indian family. OCS responds that Wilson's lack of engagement in his case plan relieved it of some of its obligations and that it provided adequate services to Wilson and his family to meet the active-efforts requirement.

OCS must, in most cases, make "timely, reasonable efforts to provide family support services to the child and to the parents . . . that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement."[18] One subsection of ICWA, 25 U.S.C. § 1912(d), requires OCS to prove that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family." "[T]he 'active efforts' requirement of ICWA is more demanding than the 'reasonable efforts' requirement of AS 47.10.086."[19]

We review the decision whether OCS made active efforts "on a case-by-case basis."[20] "As opposed to passive efforts such as simply developing a plan for the parent to follow, active efforts require that the state actually help the parent develop the

---

[18] AS 47.10.086.

[19] *Winston J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 134 P.3d 343, 347 n.18 (Alaska 2006).

[20] *Doe v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 272 P.3d 1014, 1020 (Alaska 2012) (citing *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256, 261 (Alaska 1999)).

skills required to keep custody of the children."[21]  We look "to [OCS's] involvement in its entirety" in assessing whether OCS met its burden.[22]  We have excused OCS from making active efforts when a parent is uncooperative or when further efforts would be futile.[23]

Wilson's refusal to provide basic contact information to OCS made it difficult, if not impossible, for OCS to provide him services.  Wilson contends that OCS should have thought more "creatively" of ways to contact him because OCS knew he was afraid of Sarah and as a result of this fear did not want to give OCS his contact information.  He faults OCS for not trying to get this information from him by court order; he also says that OCS "did not routinely communicate with his attorney" and "did not set up teleconferences."  OCS counters that the lack of contact was Wilson's fault — he knew how to contact OCS (and in fact did so at one point in the case).  And Wilson's attorney told the social worker that Wilson did not want to be contacted.  OCS also points out that in Wilson's appeal in the 2006 CINA case, we decided that "requiring OCS to seek court orders for every uncooperative parent would put a huge and pointless burden on the department and the court system."[24]  In reply Wilson argues that the social

---

[21]  *Dashiell R. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 222 P.3d 841, 849 (Alaska 2009) (citations omitted).

[22]  *Doe*, 272 P.3d at 1020 (quoting *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763-64 (Alaska 2009)) (internal quotation marks omitted).

[23]  *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 101-02 (Alaska 2008) (citing *K.N. v. State*, 856 P.2d 468 (Alaska 1993) and *A.A. v. State, Dep't of Family & Youth Servs.*, 982 P.2d 256 (Alaska 1999)).

[24]  *Id.* at 102.

workers' "efforts were the kind of efforts previously noted by this [c]ourt to fall short of the active efforts requirement."

There was ample testimony to support a finding that OCS made the required efforts to assist Wilson in light of his refusal to cooperate. We note that after our decision in Wilson's first appeal, Wilson was undeniably on notice that he had an obligation to engage with OCS in its efforts to assist him and his family.[25] Wilson testified that he knew how to contact OCS, and the social worker testified he did in fact call her once. He testified that he was frustrated by OCS's lack of response in the first CINA case, but nothing in the record shows that Wilson tried more than once to call OCS in the 2010 case. Neither Wilson nor his attorney contradicted Dale's testimony that the attorney told her Wilson did not want to be contacted. Dale also testified that she sent letters to Wilson about the case, but they were returned. OCS is correct that Wilson's argument here is similar to the one we rejected in his earlier appeal. OCS should not be required to obtain court orders to obtain information as basic as a telephone number from an uncooperative parent.

Wilson argues that OCS failed to provide active efforts because it knew he was unable to pay for services and OCS should have told him that it could pay for some services for him. He does not explain how OCS was supposed to communicate information about payment to him when (1) he did not give OCS basic contact information (like a telephone number) and (2) mail addressed to him was returned to OCS. Wilson testified at the termination trial that he was willing to work on his case plan, but also said he "disagreed" with the case plan requirements. He acknowledged that he had not communicated with OCS after the 2010 case started. He testified that he

---

[25]    *Id.* at 101-02 (holding that OCS was excused from active efforts because of Wilson's uncooperative behavior).

did not read most case-related documents. He also testified he gave up on the system.

ICWA requires active rather than passive efforts on OCS's part, but a parent still is required to make some effort. At the time of the termination trial in 2012, Wilson had not had contact with the children in six years — since their initial removal in 2006. The complete absence of any real attempt to complete the steps required of him to have supervised (let alone unsupervised) contact with his children suggests that, like the father in *Jeff A.C., Jr. v. State*, he was not even "remotely committed to the job of parenting."[26] In that case we said that the law "does not dictate [OCS] to force [a parent], against his will, into accepting the job [of parenting]."[27]

In his reply brief, Wilson argues that OCS "devotes a substantial amount of its brief to pointing out Wilson's behaviors during the course of a previous CINA case." Wilson asserts that his "behavior and motivation changed" during the second case because "[h]e had given up on Sarah's ability to ever get the children returned to her." Wilson did testify that he changed his mind about participating in the case plan because Sarah "couldn't hold it together long enough to take care of [the] babies." But nothing shows that he changed his actual behavior or attempted to remedy the problems that made his children in need of aid.

Based on Wilson's lack of effort to comply with either the terms of his case plan or the requirements of his divorce decree, his refusal to give OCS basic contact information so that it could notify him about events in the case and services that might be available to the family, and OCS's provision of services to both Sarah and the

---

[26]   117 P.3d 697, 707 (Alaska 2005).

[27]   *Id.*

children,[28] the trial court did not err either factually or legally in finding that OCS made active but unsuccessful efforts to prevent the breakup of this Indian family.[29]

## V.    CONCLUSION

We AFFIRM the trial court's decision terminating Wilson's parental rights.

---

[28]    *See Sarah G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, Mem. Op. & J. No. 1456, 2013 WL 1390732, at \*5 (Alaska, Apr. 3, 2013) (listing OCS's efforts in the case).

[29]    Wilson asks us to reconsider our decision in *Dashiell R. v. State, Department of Health & Social Services, Office of Children's Services*, where we stated that "the superior court was correct to point to efforts OCS made regarding the mother" when considering termination of the father's parental rights. 222 P.3d 841, 850 (Alaska 2009). But Wilson does not explain why *Dashiell R.* was erroneous when it was decided or is no longer sound because of changed conditions, a threshold question a litigant must address when seeking to overturn precedent. *See Guerrero v. Alaska Hous. Fin. Corp.*, 123 P.3d 966, 982 n.104 (Alaska 2005) (quoting *Thomas v. Anchorage Equal Rights Comm'n*, 102 P.3d 937, 943 (Alaska 2004)) (setting out standard for overruling precedent). Consequently we decline to reconsider *Dashiell R.*